FILED
United States Court of Appeals
Tenth Circuit

August 16, 2013

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

ALFRED ANAYA,

      Defendant - Appellant.

No. 12-3010

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 2:09-CR-20119-JWL-JPO-10)**

Branden A. Bell, Olathe, Kansas, appearing for Appellant.

Sheri McCracken, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with her on the brief), Office of the United States Attorney for the District of Kansas, Kansas City, Kansas, appearing for Appellee.

Before **TYMKOVICH, EBEL,** and **MATHESON,** Circuit Judges.

**MATHESON**, Circuit Judge.

Alfred Anaya was indicted on one count of conspiracy to distribute and possess

with intent to distribute cocaine, methamphetamine ("meth"), and marijuana; and on two

counts of intimidation of federal witnesses. A jury convicted him on the conspiracy charges related to cocaine and meth and on both counts of intimidation. The district court sentenced him to 292 months in prison for the conspiracy count and 240 months for the intimidation counts, to run concurrently.

Mr. Anaya argues on appeal (1) insufficiency of the evidence on conspiracy, (2) prosecutorial misconduct, (3) an erroneous willful blindness instruction, and (4) cumulative error. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I. **BACKGROUND**[1]

Count One of the indictment charged Mr. Anaya with conspiracy to distribute and possess with intent to distribute more than 5 kilograms of cocaine, more than 50 grams of meth, and marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii)(II), (b)(1)(A)(viii) and (b)(1)(D). Count One also charged him with aiding and abetting the conspiracy under 18 U.S.C. § 2. Counts Five and Six[2] charged him with intimidation of federal witnesses in violation of 18 U.S.C. § 1512(b)(1) and (3).

Evidence at trial revealed an extensive drug trafficking organization ("DTO") that bought marijuana, cocaine, and meth in California and transported the drugs for sale in Kansas. Californians Esteban Magallon-Maldanado and Cesar Bonilla-Montiel headed

---

[1] Because Mr. Anaya challenges the sufficiency of the evidence for his conviction, we recite the facts in the light most favorable to the Government. *See United States v. Baum*, 555 F.3d 1129, 1131 (10th Cir. 2009).

[2] Mr. Anaya was not charged in Counts Two through Four.

the DTO, which included around twenty individuals. Curtis Crow ran the DTO

operations in Kansas. The evidence included intercepted calls and records of hotel,

airline, and car rental costs incurred by the DTO for drug transportation. The DTO used

several vehicles that had been modified to include hidden compartments to transport

drugs. Mr. Anaya built the hidden compartments. He lived in California during this

time.

## A. *Mr. Anaya's Business with the DTO*

Mr. Bonilla-Montiel learned from a friend that Mr. Anaya installed compartments

in cars that were difficult for police to discover and open. The DTO employed Mr.

Anaya to build compartments in their vehicles. Mr. Bonilla-Montiel credited Mr. Anaya

with enabling the DTO's drug loads to travel without detection from California to

Kansas.

In late 2008, a secret compartment that Mr. Anaya had installed in the DTO's Ford

F150 truck jammed after being stuffed with $800,000. Mr. Bonilla-Montiel and Mr.

Magallon-Maldanado testified that they took the vehicle to Mr. Anaya's residence in

California, where he worked on cars. Mr. Bonilla-Montiel also brought the DTO's

Honda Ridgeline truck to determine whether Mr. Anaya could install a compartment in it.

Mr. Anaya could not open the compartment in the F150 using the series of buttons

that he had programmed to open it, so he took it apart. When the compartment opened

and Mr. Anaya could see large amounts of money inside, he said, "I don't want to see

this; I don't want any problems." ROA, Vol. II at 682. He immediately got out of the

car. He accepted $1,500 as payment for opening and repairing the F150 compartment. He continued to build compartments for the DTO, including the compartment in the Ridgeline.

Mr. Bonilla-Montiel asked Mr. Anaya to install a compartment in the Ridgeline that was large enough to hold "at least 10 kilos" and showed him a red brick to indicate the approximate size of a kilo. *Id.* at 711. While Mr. Anaya was building the compartment in the Ridgeline, the DTO used the compartment he installed in the F150 to transport six kilos of cocaine and five pounds of meth. Police stopped the F150 during this time as it was travelling with drugs from California to Kansas, but they could not find or open Mr. Anaya's compartment and released the F150 and its drivers. Mr. Crow sold the drugs from the F150 to two of the DTO's top distributors for approximately $70,000-$80,000.

In 2009, officers began surveillance of DTO operations, including a wiretap that intercepted calls to and from Mr. Anaya between January 30, 2009, and November 29, 2009. During this time, the officers witnessed DTO members dropping off and picking up many vehicles from Mr. Anaya's residence and Mr. Anaya meeting with known drug dealers.

On February 19, 2009, officers saw a white Toyota Sequoia arrive at Mr. Anaya's home. Mr. Bonilla-Montiel testified that he and Mr. Magallon-Maldanado drove the Sequoia to Mr. Anaya's home to pick up the Ridgeline. After Mr. Anaya showed them how to work the Ridgeline's hidden compartment, they paid him $5,000 in $10 and $20

bills and took the Ridgeline. Mr. Crow and other DTO members loaded the Ridgeline's compartment with 100 pounds of marijuana. Another DTO member, Jaime Rodriguez, drove it from California to Kansas. Mr. Crow then left the Ridgeline, still loaded with marijuana, at DTO member Noah Adams's house in Kansas for safekeeping.

On another occasion, Mr. Rodriguez transported cocaine and meth in the Ridgeline's compartment from California to Kansas. On that trip, Mr. Rodriguez was pulled over and given a speeding ticket, but no drugs were detected. After the trip, Mr. Crow kept the Ridgeline at his house in Kansas and used it as a safe for drugs and money. Mr. Rodriguez also made later trips in the Ridgeline to transport marijuana.

Mr. Bonilla-Montiel, Mr. Magallon-Maldanado, and Mr. Crow arranged for Mr. Anaya to install a hidden compartment between the back seats of the Toyota Sequoia for "4 kilos or to store money." ROA, Vol. II at 711. Mr. Anaya charged them $4,500 for the work on the Sequoia. Mr. Anaya warned Mr. Crow not to show anyone how to open the compartment or where it was located because the police had apprehended previous cars with his compartments. Mr. Crow later unloaded cocaine from the compartment in the Sequoia. Mr. Bonilla-Montiel and other DTO members transported cocaine and proceeds from marijuana sales between California and Kansas in the Sequoia.

On March 30, 2009, Mr. Bonilla-Montiel went to Mr. Anaya's house to pick up the Sequoia and drop off a Toyota Camry so that Mr. Anaya could figure out where to put a compartment. Mr. Bonilla-Montiel testified that the compartment in the Camry was to hold drugs or money, and that it was Mr. Crow's car at the time.

On April 5, 2009, police officers stopped several DTO members during a return trip to California. Officers found $106,000 in heat-sealed packets in the Sequoia's hidden compartment and noted that someone had insulated the "sophisticated" compartment to mask the smell of drugs. ROA, Vol. II at 899.

On April 4-6, 2009, officers intercepted calls between Mr. Bonilla-Montiel and Mr. Anaya, during which Mr. Anaya said that he could put "three speakers" in the Camry for $2,500. *Id.* at 1046-47. Mr. Bonilla-Montiel testified "three speakers" was their code term for three kilos or three pounds of meth. *Id.* at 752-53. Once Mr. Anaya completed the compartment in the Camry, DTO members used the car to transport two pounds of meth from California to Kansas in the hidden compartment.

On April 24, 2009, officers stopped the Camry and found the two pounds of meth concealed in the compartment. Mr. Crow and Mr. Bonilla-Montiel then began to fear that Mr. Anaya was involved with the police. They traded the Ridgeline for an Altima and did no further business with Mr. Anaya.

On November 18, 2009, police executed a search warrant at Mr. Anaya's home and shop. Officers found more than 15 removed airbags, insulation, electrical devices required to build the hidden compartments, rifles, shotguns, pistols, bulletproof vests, and various ammunition. They found stereo wires but no speakers. Mr. Anaya confessed that he had built hidden compartments in cars for more than ten years.

## B. *Witness Intimidation*

Mr. Bonilla-Montiel testified that, while they were both held in Community Corrections of America ("CCA"), a private detention center, Mr. Anaya asked him to sign a letter that relieved Mr. Anaya of responsibility in the case. Mr. Anaya asked him to sign in the presence of another prisoner who was known for fighting with prisoners who did not go along. He testified that he "knew if [he] didn't sign it, there was going to be trouble" and that he felt like he did not have a choice. *Id.* at 875. After he signed the letter, "there was not any more trouble . . . everything was calm and quiet." *Id.* at 880.

DTO member Jose Villanueva-Coyaso testified that Mr. Anaya asked him and another DTO member when all three were in CCA to sign papers saying they did not know Mr. Anaya. When Mr. Villanueva-Coyaso said he wanted to show the letter to his lawyer, Mr. Anaya became "very aggressive" and insulted him. *Id.* at 2596-97. Mr. Villanueva-Coyaso testified that Mr. Anaya said, "If you guys fall down the stairs, don't ask me for anything. I'm dead to you guys." *Id.* at 2597. No one in the pod would talk to them after they refused to sign. *Id.* at 2597-98. After Mr. Villanueva-Coyaso signed the letters, "[e]verything went back to normal." *Id.* at 2608.

## C. *Conviction and Sentencing*

After the Government presented its case, Mr. Anaya moved for a judgment of acquittal under Rule 29. The district court denied the motion, finding there was sufficient evidence for a reasonable jury to find him guilty. The jury found Mr. Anaya guilty of the

single count of conspiracy and the two counts of witness intimidation. But using a special verdict form, the jury found him responsible for conspiring to distribute and possess with intent to distribute only cocaine and meth and not marijuana. Mr. Anaya then moved again for acquittal and for a new trial. The district court denied those motions. The court sentenced him to 292 months of imprisonment for the conspiracy count and 240 months for the intimidation counts, to run concurrently. Mr. Anaya filed a timely appeal.

Further background facts will be presented as part of the following discussion section.

## II. **DISCUSSION**

Mr. Anaya appeals his conviction on four grounds. He argues (A) the evidence was insufficient for the jury to convict him of conspiracy; (B) prosecutorial misconduct precluded a fair trial; (C) the district court erred by instructing the jury on willful blindness, and (D) the "total weight of the errors" created a cumulative error that affected the outcome of his trial. We address each of his arguments in turn.

### A. *Sufficiency of the Evidence on Conspiracy*

1. **Standard of Review**

"We review . . . the sufficiency of the evidence to support a conviction . . . de novo." *United States v. Apperson*, 441 F.3d 1162, 1209 (10th Cir. 2006) (quotations omitted). We "tak[e] the evidence—both direct and circumstantial," and reasonable inferences drawn from that evidence—"in the light most favorable to the government"

and ask "only whether . . . a reasonable jury could find [the defendant] guilty beyond a reasonable doubt." *United States v. Kaufman*, 546 F.3d 1242, 1263 (10th Cir. 2008) (quotations omitted); *see also United States v. Dobbs*, 629 F.3d 1199, 1203 (10th Cir. 2011).

## 2. Conspiracy Law and Mr. Anaya's Arguments

To prove a conspiracy, the Government must show "(1) that two or more persons agreed to violate the law, (2) that the defendant knew at least the essential objects of the conspiracy, (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent." *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009). In a drug conspiracy case, the Government is not required to prove that the defendant possessed the drugs, *United States v. Slater*, 971 F.2d 626, 631 (10th Cir. 1992), or played a major role in the conspiracy, *United States v. Zimmerman*, 943 F.2d 1204, 1209 (10th Cir. 1991).

Mr. Anaya's sufficiency of the evidence arguments contest only whether the Government proved his knowledge of "the essential objects of the conspiracy" (second element) and knowledge that he "became a part of it" (third element). He does not deny that he voluntarily joined the conspiracy. Instead, he argues that he did not *knowingly* join the conspiracy because he did not know its scope and objectives. Although he concedes knowing that the DTO used his compartments for illegal activity, he contends the Government failed to prove that he knew the DTO used his compartments for drug trafficking and what types of drugs the DTO trafficked. Mr. Anaya's arguments combine

-9-

the second and third elements of conspiracy and overstate what the Government was required to show.

The Government needed to prove that Mr. Anaya had "a general awareness of both the scope and the objectives of the conspiracy." *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1123 (10th Cir. 2011). Evidence that he knew all of the details of the DTO's operations was not necessary, only that he "shared a common purpose or design with his alleged coconspirators." *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992) (quotations omitted).

The government did not need to prove that Mr. Anaya knew of every type or amount of drug trafficked by the conspiracy. In *United States v. De La Torre*, 599 F.3d 1198 (10th Cir. 2010), we explained that 21 U.S.C. § 841(a)(1) "does not require the Government to prove a defendant knew the precise nature of the controlled substance he possessed, so long as he knew he did in fact possess a controlled substance." *Id.* at 1204.[3] Although Mr. De La Torre was charged with possessing controlled substances and not with conspiracy, the same reasoning applies to defendants charged with conspiracy. The knowledge element of conspiracy was satisfied if the Government

---

[3] Mr. Anaya's indictment also listed 21 U.S.C. § 841(b)(1)(A)(ii)(II), (b)(1)(A)(viii) and (b)(1)(D). Those subsections address the penalties for violations of § 841(a)(1). Mr. Anaya challenges sufficiency of the evidence for his conviction. He does not challenge his sentencing.

proved that Mr. Anaya knew that conspiracy members "knowingly or intentionally" possessed a "controlled substance" with the intent to distribute it. 21 U.S.C. § 841(a).[4]

"[K]nowledge [of illegal activity] and presence [at the crime scene] coupled with knowing participation in the illegal drug activities are sufficient to sustain a drug conspiracy." *United States v. Coyote*, 963 F.2d 1328, 1331 (10th Cir. 1992). Evidence of a defendant's actions can be used to establish the defendant's knowledge "in the context of a conspiracy prosecution." *United States v. Wacker*, 72 F.3d 1453, 1469 (10th Cir. 1995).

3. **Sufficient Evidence of Knowledge**

At trial, the Government presented evidence that Mr. Anaya

- built multiple hidden compartments in vehicles for the DTO that were insulated to mask the smell of drugs;
- witnessed $800,000 in one of his compartments in a DTO vehicle;
- used "kilos" as a unit of measurement for building compartments;
- communicated by phone with the DTO through a secret code to discuss compartment sizes; and
- warned Mr. Crow not to discuss the compartments or how they worked with anyone to avoid police detection.

---

[4] *See also United States v. Garcia*, 580 F.3d 528, 535 (7th Cir. 2009) (explaining that "drug type and quantity are not elements of conspiracy; to sustain a conviction, [the defendant] need not have known the specific drug as long as she was aware that a controlled substance was involved"); *United States v. Villarce*, 323 F.3d 435, 439 & n.1 (6th Cir. 2003) ("[T]he government need not prove mens rea as to the type and quantity of the drugs" to establish sufficient evidence for a drug conspiracy conviction because "the mens rea element of § 841(a) . . . requires nothing more specific than an intent to distribute a controlled substance." (quotations omitted)).

Evidence of Mr. Anaya's actions—installing secure, hidden compartments, which furthered the conspiracy's goals—pointed to his knowing participation in the conspiracy. *Wacker*, 72 F.3d at 1469. A reasonable jury could infer from the evidence that Mr. Anaya knew the conspiracy's general drug-trafficking goals and knew that he helped the DTO to transport drugs without detection. The conspiracy's objective was to transport drugs, and the compartments that Mr. Anaya custom made for the conspiracy were instrumental to fulfilling that goal. The evidence was therefore sufficient to establish the second and third elements of conspiracy.

Mr. Anaya relies on *United States v. Lovern*, 590 F.3d 1095 (10th Cir. 2009), in which we reversed the conspiracy conviction of a computer technician at an Internet pharmacy. Although evidence showed it was likely he "knew something was wrong," the evidence was insufficient that he knew he was helping fill prescriptions "outside the usual course of professional medical practice or without a legitimate medical purpose." *Id.* at 1100, 1109 (quotations omitted). Unlike Mr. Lovern, who performed routine tasks and never had contact with the prescribing doctors, Mr. Anaya performed a specialized task that was integral to the DTO's goals, and he interacted directly with the conspiracy's leaders.

Based on the foregoing, Mr. Anaya's challenge to the sufficiency of the evidence on his conspiracy conviction fails.

B. *Prosecutorial Misconduct*

Mr. Anaya alleges that six instances of prosecutorial misconduct rendered his trial so unfair as to make his conviction a violation of due process. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48 (1974). Prosecutorial misconduct violates a defendant's due process if it "infect[s] the trial with unfairness" and "deni[es] the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quotations omitted). "The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." *Wilson v. Sirmons*, 536 F.3d 1064, 1117 (10th Cir. 2008) (quotations omitted). In addition to this due process fairness standard, our cases have addressed the appellate standard of review for prosecutorial misconduct based on four trial scenarios.

First, when the defendant objects at trial based on prosecutorial misconduct and the district court overrules the objection, we conduct a de novo review for error. *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1134 (10th Cir. 2004). "In conducting that review, we first decide whether the conduct was improper and then, if so, whether the Government has demonstrated that error was harmless beyond a reasonable doubt." *United States v. Sierra-Ledesma*, 645 F.3d 1213, 1227 (10th Cir. 2011).

Second, when the defendant objects at trial based on prosecutorial misconduct, the district court sustains the objection and takes curative action such as giving a jury instruction, and the defendant objects to the adequacy of the curative action or asks for a mistrial, we review for abuse of discretion. *United States v. Gabaldon*, 91 F.3d 91, 94

(10th Cir. 1996); *see also United States v. Taylor*, 514 F.3d 1092, 1095-96 (10th Cir. 2008); *United States v. Caballero*, 277 F.3d 1235, 1242 (10th Cir. 2002); *United States v. Villa-Chaparro*, 115 F.3d 797, 803 (10th Cir. 1997).

Third, when the defendant objects at trial based on prosecutorial misconduct, the district court sustains the objection and takes curative action such as giving a jury instruction, and the defendant fails to object to the adequacy of the curative action or ask for a mistrial, we review for plain error. *United States v. Taylor*, 514 F.3d 1092, 1096 (10th Cir. 2008). In such cases, the defendant has given the district court "no reason to believe any further issue or concern remain[s]," and the court therefore could not "exercise its judgment in the first instance." *Id.* The primary focus of our review in this scenario is "whether the district court's failure sua sponte to grant a mistrial or issue some further curative instructions was plain error." *Id.* at 1099.

Fourth, when the defendant does not object at trial based on prosecutorial misconduct but makes that allegation on appeal, we review for plain error. *See United States v. Dazey*, 403 F.3d 1147, 1170 (10th Cir. 2005); *United States v. Caballero*, 277 F.3d 1235, 1244 (10th Cir. 2002); *United States v. Gonzalez-Montoya*, 161 F.3d 643, 650 (10th Cir. 1998); *United States v. May*, 52 F.3d 885, 887 (10th Cir. 1995).[5] Under plain error review, "reversal is warranted only when: the prosecutor's statement is plainly

---

[5] Similarly, when the district court overrules an objection on other grounds, but the defendant does not object to the prosecutorial misconduct as alleged on appeal, and the defendant makes no further objection or request for mistrial, we review for plain error. *United States v. Baldridge*, 559 F.3d 1126, 1134-35 (10th Cir. 2009).

improper and (2) the defendant demonstrates that the improper statement affected his or her substantial rights." *United States v. Fleming*, 667 F.3d 1098, 1103 (10th Cir. 2011).[6]

As the parties agree, all of Mr. Anaya's six allegations of prosecutorial misconduct are subject to plain error review. Allegation 6 and part of allegation 4 fall into the third scenario described above. The rest fall into the fourth.

1. **Vouching**

In the redirect examination of DEA Case Agent Perry Williams, the prosecutor engaged in the following exchanges:

> Q: [C]ase agents have the right to terminate a proffer for lack of truthfulness, correct?
> A: Yes, they do.
> Q: And . . . in this case, you've had to terminate interviews or I've terminated them for lack of truthfulness, correct?
> A: That is correct.
> Q: And we will walk away from that person and not use them as a witness, is that right?
> A: Yes, ma'am.
> . . .
> Q: There were several cooperating witnesses in this case; right?
> A: Yes, there are.
> Q: We didn't use all of them, did we?
> A: No, we did not.
> . . .
> Q: Now, there were proffers where we confirmed that they just simply were contradictory, right?
> A: Yes.
> Q: Those witnesses weren't called by the government, were they?

---

[6] Mr. Anaya alleges six instances of prosecutorial misconduct. All but one involved statements during witness examination, an objection to a defense counsel question, or closing argument. As discussed below, Mr. Anaya's remaining allegation that the Government misstated facts in a pretrial motion is factually incorrect.

A: No, they were not.

ROA, Vol. II at 387-88, 3194-95.

Mr. Anaya argues that these exchanges led the jury to believe that the prosecutor had verified the truthfulness of her witnesses with evidence that was not before the jury. Because Mr. Anaya did not object to these exchanges, we review for plain error. *Dazey*, 403 F.3d at 1170.

Vouching requires "either . . . explicit personal assurances of the witness's veracity or . . . implicit[] indicat[ions] that information not presented to the jury supports the witness's testimony." *United States v. Orr*, 692 F.3d 1079, 1097 (10th Cir. 2012) *cert. denied*, 133 S. Ct. 1300 (2013) (quotations omitted). An attorney's comment of personal belief in a witness's credibility is improper. *See United States v. Magallanez*, 408 F.3d 672, 677 (10th Cir. 2005). "Argument or evidence is impermissible vouching only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony." *United States v. Bowie*, 892 F.2d 1494, 1498 (10th Cir. 1990).

Prosecutors may respond when "unfair innuendoes [are] cast into the mix by defense counsel;" otherwise, jurors could conclude that the accusations were true. *United States v. Shelton*, 736 F.2d 1397, 1407 (10th Cir. 1984).

The prosecutor's exchanges with Agent Williams occurred after the defense vigorously attacked the Government's first cooperating witness, suggesting that

-16-

Government witnesses improperly rehearsed their testimony and that the Government made promises and warnings during proffer interviews to secure cooperation. The prosecutor was allowed to respond under *Shelton.* In addition, the prosecutor never suggested that she verified every witness's testimony, only that some witnesses were excluded for lying. Her statements were therefore not plainly improper.

2. **Evidence Outside of the Record**

Mr. Anaya argues that the prosecutor used evidence that had not been admitted at trial to prove Mr. Anaya's guilt. He points to the prosecutor's asking during closing argument, "Could we have played more and more calls? Absolutely. Could we have sat you through hours and hours and hours of recorded conversations? Sure. Was it necessary? No." Suppl. ROA at 237. Full transcripts of all of the tapes referenced by the prosecutor were admitted into evidence at trial and available to the jury. The prosecutor did not refer to evidence outside of the record. Mr. Anaya did not object, and his argument completely lacks merit.

3. **Assertion About the Government's and Defense Counsel's Roles**

Mr. Anaya alleges that three prosecutor statements suggested to the jury that the Government only presents the truth at trial and the defense counsel's job is to mislead.

The first statement came in the prosecutor's objection to defense counsel's cross-examination of a Government witness who had pled guilty to charges of his own and had yet to be sentenced. Defense counsel questioned the witness about his understanding of the "safety valve" provision, by which the prosecutor can recommend a lower sentencing

range for "truthfully provid[ing] to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f)(5).

> Defense Counsel: And so, for example, you understand well enough in the process that, if [the prosecutor] wants to argue to the judge that you should not be safety valve eligible, that she could do that?
>
> Prosecutor: Your Honor, objection. The government can only make objections at sentencing based on the truth. We don't make objections to any other witnesses around or shade the truth. This is completely improper.
>
> Court: I disagree. The question is a proper question. The government may make an argument at sentencing that it did not believe what the witness said. The government may be right, the government may be wrong. The judge will ultimately decide that. The question is proper. The objection is overruled.

ROA, Vol. II at 2674-75.

> Second, Mr. Anaya notes another exchange involving the prosecutor:

> Prosecutor: Mr. Villanueva, do you understand that I don't have a client?
>
> Witness: I do understand.
>
> Prosecutor: I don't represent a defendant, do you know that?
>
> Witness: Yes.
>
> Prosecutor: All right. The only thing I'm required to do is argue the truth and the facts, do you know that?
>
> Witness: Yes.
>
> Prosecutor: So do you understand that I can't come in here and shade the facts because I don't like you or I didn't want you to get the safety valve?
>
> Defense Counsel: Judge, I object to that as leading.
>
> Court: The objection leading is overruled.

ROA, Vol. II at 2676-77.

> Third, Mr. Anaya points to another statement in the beginning of the prosecutor's closing rebuttal:

-18-

You know, I always find it interesting when defense attorneys talk about why the government does the things that we do. It reminds me of how very different our jobs are and what we do. I don't have a client. They serve the defendant. Mr. Williams and I don't put cooperators on the stand with the hope they will make us happy. There's only one thing that makes the government happy, and it's if you tell the truth.

Suppl. ROA at 218.

Mr. Anaya argues that the prosecutor's statements distracted the jurors from the evidence by focusing their attention on her credibility and suggesting his counsel's job was to trick them. At trial, Mr. Anaya did not object to the statement made in closing argument and only objected to the prosecutor's questioning of the witness as leading. The district court overruled that objection. The issue of prosecutorial misconduct alleged on appeal was not presented to the district court to decide in the first instance. We therefore review for plain error. *United States v. Baldridge*, 559 F.3d 1126, 1134-35 (10th Cir. 2009).

In *Berger v. United States*, 295 U.S. 78 (1935), the Supreme Court deemed a prosecutor's statement about defense counsel to be misconduct and reversed the defendant's conviction because the cumulative effect of this and other misconduct unduly influenced the jury. *Id.* at 89. The prosecutor stated that defense counsel could "twist the questions" and "devise ways to pass counterfeit money." *Id.* at 88. Among other things, the prosecutor also misstated facts, bullied witnesses, and "conduct[ed] himself in a thoroughly indecorous and improper manner." *Id.* at 84. The Supreme Court determined that the prosecutor's behavior was so prejudicial that a new trial was required. *Id.* at 89.

-19-

Here, the prosecutor's three statements did not approach in substance the statements found objectionable in *Berger*. Indeed, they were less concerning than statements we have determined were *not* plain error. *See United States v. May*, 52 F.3d 885, 887-89 (10th Cir. 1995) (holding that prosecutor's suggestion that the defendant provided false testimony on the advice of his counsel was not reversible plain error).

As to the first two statements—the prosecutor's objection and subsequent questioning of a witness—she said nothing about the truthfulness of defense counsel. Instead, the prosecutor defended the Government against the defense counsel's accusation that, unless witnesses testify as the Government wants, the Government will not recommend them for safety valve sentencing reductions.

The prosecutor's statement in her rebuttal responded to defense counsel's closing argument, in which he stated that the Government witnesses had "everything to lose and everything to gain" depending on whether they "please the Government" and the prosecutor. Suppl. ROA at 208. The prosecutor responded that she did not "put cooperators on the stand with the hope they will make us happy. There's only one thing that makes the government happy, and it's if you tell the truth." Suppl. ROA at 218.

We generally give prosecutors latitude in making closing arguments when defense counsel "invites" the argument. *United States v. Janus Indus.*, 48 F.3d 1548, 1558 (10th Cir. 1995). Defense counsel's closing argument here invited the prosecutor to address the truthfulness of the Government's witnesses. The prosecutor's statement in her

rebuttal did just that, without making any overt statement about defense counsel's truthfulness.[7]

The prosecutor's three statements were not plainly improper.

4. **Testifying Against a Witness**

Mr. Anaya argues that prosecutorial misconduct occurred during the following questioning of Ricardo Limon, a defense witness:

> Q: You are currently facing an enhancement for intimidating witnesses of your own, aren't you?
> A: No.
> Q: You're not aware of that?
> A: No.
> Q: You're facing two additional levels for intimidating witnesses. This is news to you?
> A: I was facing them, but since I plead, you said you were not going to do that.
> Q: No, I did not say that.
> A: Oh, okay.
> Q: Not ever. Now, Mr. Limon, you're facing enhancements for intimidating witnesses of your own, aren't you?
> A: I guess I am.

---

[7] In addition to our precedent from *Janus Industries*, other circuits have held that a prosecutor's closing argument focusing on defense counsel's comments, not character, is acceptable. *See United States v. Lore*, 430 F.3d 190, 213 (3d Cir. 2005); *United States v. Millar*, 79 F.3d 338, 343-44 (2d Cir. 1996) (holding that prosecution's reference to defense counsel's arguments as "hog wash" and a "smoke screen" did not warrant new trial); *United States v. Santiago*, 46 F.3d 885, 892 (9th Cir. 1995) (holding there was no error in permitting prosecution comments that defense counsel's arguments were devaluing the victim and "dirtying up" witnesses); *United States v. Hartmann*, 958 F.2d 774, 785 (7th Cir. 1992) (holding there was no error in allowing prosecution to remark that defense told a "whopper" and tried to mislead the jury). The prosecutor's comments here fall into this category.

ROA, Vol. II at 3153-54. Mr. Anaya argues that the prosecutor impermissibly discredited the witness with her own testimony.

He alleges this happened again on re-cross examination:

Q: You had no plea agreement, did you, Mr. Limon?
A: I don't know if it was a plea agreement or not, but I just pled guilty.
   . . .
Q: No. There's no plea agreement. There's no agreement signed by the government. There's no two-point enhancement that we didn't agree to. Mr. Limon, the only way to get out of that is to prove that you didn't intimidate witnesses, just like you're trying to help Mr. Anaya do.
Defense counsel: Judge, I'm sorry. Is counsel testifying?
Q: Isn't that correct?
A: I'm not trying to help him. I'm just—
Q: Isn't that correct? Yes or no?
Court: Do you want to restate the question as a question and not as a declaration?

*Id.* at 3165.

Finally, Mr. Anaya alleges that the prosecutor suggested in her rebuttal closing argument that defense counsel downplayed this witness's testimony because he was untruthful:

I wonder if you're asking yourselves, hmm, I really didn't hear a lot of talk about that Limon guy they stuck on the stand. I'm sure you can figure out why. Mr. Limon's testimony was laughable. Mr. Limon doesn't know the truth if it hit him in the face.

Suppl. ROA at 220.

Mr. Anaya argues that, through these statements, the prosecutor impermissibly used outside evidence and her own testimony to discredit this defense witness.

-22-

In the first exchange, the prosecutor made two declarative statements. The first one—"You're facing two additional levels for intimidating a witness"—was followed by a question—"This is news to you?" ROA, Vol. II at 3153-54. This is close to a permissible leading question and does not give us much pause. In response to the Mr. Limon's answer—"I was facing them, but since I plead, you said you were not going to do that"—the prosecutor made her second declarative statement—"No, I did not say that." *Id.* at 3154. The prosecutor followed with another declaration—"Not ever." Mr. Anaya's counsel did not object. *Id.* at 3154.

In the second exchange, the prosecutor delivered a four-sentence, almost 50-word, statement contesting the witness's testimony. This time defense counsel objected, and the court asked the prosecutor to restate her declaration as a question. Mr. Anaya's counsel did not contest the adequacy of the court's curative action or ask for a mistrial.

The prosecutor's closing argument challenging Mr. Limon's credibility was, on its face, within the bounds of closing argument advocacy. *See United States v. Hernandez-Muniz*, 170 F.3d 1007, 1012 (10th Cir. 1999) (concluding that a prosecutor's statements about a witness's credibility made during closing argument was not improper). But it was based in part on the prosecutor's examination of the witness that contained her declarative statements. Mr. Anaya's counsel did not object to the closing argument

-23-

statements.[8]

We review Mr. Anaya's challenge to these statements for plain error.[9] Mr. Anaya cannot succeed on this issue because he has not shown that they affected his substantial rights. First, the statements impeached the witness's credibility but did not address Mr. Anaya's alleged crimes. Second, Mr. Anaya has not shown that any of the statements were false. Third, and most important, the evidence against Mr. Anaya was too strong for these statements to have made a difference.[10]

Mr. Anaya falls short on this part of his appeal.

---

[8] During Mr. Limon's testimony, the prosecutor did not call him a liar; she attempted to correct an inaccuracy in his testimony. Even so, "it is not per se prosecutorial misconduct to refer to testimony as a lie." *United States v. Kravchuk*, 335 F.3d 1147, 1154 (10th Cir. 2003); *see also Bland v. Sirmons*, 459 F.3d 999, 1025 (10th Cir. 2006) (holding that the prosecutor's characterization of a habeas petitioner as a liar *may* have been excessive but was permissible in light of the petitioner's testimony and did not constitute a violation of due process); *United States v. Robinson*, 978 F.2d 1554, 1567 (10th Cir. 1992) ("[A] prosecutor would be well advised to avoid directly accusing a defendant of lying [but] we are confident that the statements in this case would have been perceived only as commentary on the implausibility of the defendant's story." (quotations omitted)).

[9] The statements in the first exchange with the witness and during closing argument are subject to plain error review under the fourth trial scenario described above because Mr. Anaya's counsel did not object. He did object to the statement in the second exchange, but after the objection was sustained and the prosecutor was admonished to ask a question, he did not ask for further curative relief or for a mistrial. Plain error review is thus appropriate based on the third trial scenario described above.

[10] Although Mr. Anaya's counsel objected to the second exchange, he did not object after the district court asked the prosecutor to rephrase the question. The district court did not plainly err by failing to grant a mistrial sua sponte based on the prosecutor's conduct because it was far from "clear or obvious" that it needed to do so. *Taylor*, 514 F.3d at 1100.

5. **404(b) Motion**

Before trial, the Government asked to introduce evidence about cars seized from known drug dealers who were not connected to the DTO and who had visited Mr. Anaya's home. The cars were seized during traffic stops and contained compartments like those built by Mr. Anaya for the DTO. The compartments contained guns or drugs.

Mr. Anaya contends that, in its motion to present rule 404(b) evidence, the prosecution misstated its factual basis to introduce evidence of these traffic stops, which were unrelated to the alleged conspiracy in this case.

In its 404(b) motion, the Government argued that this other acts evidence was "intertwined with the conspiracy." ROA, Vol. I at 280. The district court admitted the evidence over Mr. Anaya's objection. At the pretrial limine conference, the court instructed Mr. Anaya that he could object again at trial if Mr. Crow's testimony did not support the evidence as proffered. At trial, there was no objection. On appeal, Mr. Anaya raises this issue only as a prosecutorial misconduct claim. He does not challenge the actual admission of the evidence. Because his objection was not based on prosecutorial misconduct, we review only for plain error. *Baldridge*, 559 F.3d at 1134-35.

Mr. Anaya alleges that the Government sought to enter this evidence to support Mr. Crow's testimony that Mr. Anaya warned him about other cars containing his compartments that the police had stopped. He contends this was disingenuous because the evidence at issue concerned vehicle stops that only occurred *after* the conversation

between Mr. Crow and Mr. Anaya and therefore could not have been the subject of Mr. Anaya's alleged warning.

The Government never argued, however, that the cars in the 404(b) evidence were the same cars Mr. Anaya was discussing when he warned Mr. Crow. In the "Factual Summary and Introduction" section of its 404(b) notice, the Government's timeline shows that Mr. Crow was arrested in September 2009 (ROA, Vol. I at 265), while the vehicles of Mr. Anaya's non-DTO clients were seized in September 2009, November 2009, and February 2010 (ROA, Vol. I at 281-82). The Government could not have argued that Mr. Anaya was referring to those seizures when he warned Mr. Crow because they occurred after Mr. Crow was arrested and his contact with Mr. Anaya had ended. Mr. Anaya's argument lacks any factual foundation, and we therefore find no plainly improper conduct.

### 6. Encouraging Anger from the Jury

Mr. Anaya argues that the prosecutor impermissibly encouraged the jury during her closing argument to feel anger toward Mr. Anaya: "[T]hat should make you angry, that a witness was intimidated [by Mr. Anaya] in this matter. It should make everybody angry." Suppl. ROA at 157. Mr. Anaya objected to the statement as "improper argument." *Id.*

"Prosecutors are not permitted to incite the passions of the jury by suggesting they can act as the 'community conscience' to society's problems." *United States v. Rogers*, 556 F.3d 1130, 1143 (10th Cir. 2009) (quoting *United States v. Solivan*, 937 F.2d 1146,

1151 (6th Cir. 1991)).  The Government concedes that the prosecutor should not have told the jurors that they should be angry with Mr. Anaya.

In *Rogers*, we held that statements no more inflammatory than in this case constituted harmless error because the Government's case against the defendant was already strong and the jury was properly instructed that closing arguments are not evidence.  556 F.3d at 1142-43 (finding that a closing argument calling on the jury to "cr[y] out" to law enforcement for help with a social problem constituted harmless error).

Although the prosecutor should not have made these statements, the district court properly instructed the jury before closing argument that "statements and arguments of counsel are not evidence in the case unless made as admissions or stipulations of fact." ROA, Vol. I at 377.  We assume that jurors follow the court's instructions.  *United States v. Castillo*, 140 F.3d 874, 884 (10th Cir. 1998).  In addition, the court sustained Mr. Anaya's objection.

Mr. Anaya made no further objection and did not request a mistrial.  We therefore review the district court's failure to grant a mistrial sua sponte based on prosecutorial misconduct for plain error.  *Taylor*, 514 F.3d at 1099.  Whatever improper conduct may have occurred, the district court did not plainly err by failing to grant a mistrial.  In light of the jury instruction that closing argument is not evidence, the court's sustaining Mr. Anaya's objection, and especially the strength of the evidence against him, the district court was not clearly obligated to grant a mistrial sua sponte.  *Id.* at 1100-01; *United States v. Devous*, 764 F.2d 1349, 1356 (10th Cir. 1985).

-27-

*     *     *

In sum, none of the conduct Mr. Anaya asks us to review constitutes plain error.

## C. *Willful Blindness Instruction*

At trial, the Government proposed a jury instruction on willful blindness. Mr. Anaya objected but conceded that case law does not support his position. The district court overruled his objection. The court did, however, amend the instruction at Mr. Anaya's request to remove a portion that he claimed impermissibly shifted the burden of proof.

The jury was given the following instruction:

INSTRUCTION NO. 20

When the word "knowingly" is used in these instructions, it means that the act was done voluntarily and intentionally, and not because of mistake or accident. Although knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact. Thus, in this case, knowledge could be inferred if defendant Alfred Anaya was aware of a high probability that concealed compartments that he built in vehicles would be used to transport illegal narcotics and the proceeds derived from their sale.

ROA, Vol. I at 363. Mr. Anaya argues that the evidence at trial did not support giving this instruction.

## 1. **Standard of Review**

We review the jury instructions as a whole de novo to determine if "they accurately state the governing law and provide the jury with an accurate understanding of

-28-

the relevant legal standards and factual issues in the case." *United States v. Crockett*, 435 F.3d 1305, 1314 (10th Cir. 2006); *see also United States v. Park*, 421 U.S. 658, 674 (1975). When a defendant challenges a particular jury instruction on the ground that the evidence did not support it, we generally review the district court's decision to give the instruction for abuse of discretion. *See, e.g.*, *United States v. Berry*, 717 F.3d 823, 828-29 (10th Cir. 2013). Nonetheless, since *United States v. de Francisco-Lopez*, 939 F.2d 1405, 1409 (10th Cir. 1991), we have reviewed such challenges to willful blindness instructions de novo, considering the underlying evidence in the light most favorable to the Government. *United States v. Delreal-Ordones*, 213 F.3d 1263, 1264 & n.1 (10th Cir. 2000).

Even if a willful blindness instruction is given in error, "we may . . . allow the conviction to stand if we find beyond a reasonable doubt that the error was harmless." *Francisco-Lopez*, 939 F.2d 1405, 1412 (10th Cir. 1991); *see also Chapman v. California,* 386 U.S. 18, 24 (1967). Because we find that any potential error was harmless, Mr. Anaya's challenge to the jury instruction fails under either abuse of discretion or the less deferential de novo standard.

2. **Analysis**

The basis for the instruction appears to be the evidence that Mr. Anaya opened a jammed compartment in a DTO car, saw $800,000, and commented that he did not want to see the cash or have any problems. This incident occurred in the context of his knowing and active facilitation of the DTO's drug trafficking over several months.

The substantial evidence of Mr. Anaya's knowing and voluntary assistance of the DTO's drug dealing supported a guilty verdict. Mr. Anaya routinely built compartments for DTO vehicles, enabled the conspiracy to transport drugs without detection, saw that the DTO sometimes transported large amounts of cash in the compartments, designed compartment sizes in measurements of kilos, used a secret code when discussing compartments by phone, and warned Mr. Crow about the possibility of police detection. We conclude that any error in giving the willful blindness instruction was harmless beyond a reasonable doubt.

### D. *Cumulative Error*

Finally, Mr. Anaya argues that the errors he alleges, taken together, deprived him of a fair trial and led to his conviction. To analyze cumulative error, we aggregate all the errors that we have found to be harmless and determine "whether their cumulative effect on the outcome of the trial" mandates reversal. *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990).

Cumulative error analysis applies only if true errors occurred. *See United States v. Barrett*, 496 F.3d 1079, 1121 (10th Cir. 2007); *Moore v. Gibson*, 195 F.3d 1152, 1175 (10th Cir. 1999). We have not held that any errors occurred. Even so, we have determined that the willful blindness instruction was harmless and the prosecutor's statements on witness credibility did not affect Mr. Anaya's substantial rights. We did not determine whether those alleged errors constituted actual errors but instead concluded that any potential errors did not merit reversal because they did not affect the outcome of

Mr. Anaya's case.  For the purposes of cumulative error analysis, we assume without deciding that these alleged errors were errors and proceed accordingly.

"[W]hen there are both preserved and unpreserved errors, cumulative-error analysis should proceed as follows:  First, the preserved errors should be considered as a group under harmless-error review.  If, cumulatively, they are not harmless, reversal is required." *United States v. Caraway*, 534 F.3d 1290, 1302 (10th Cir. 2008).  The only potential preserved error is the willful blindness instruction.  Without other errors to aggregate, there can be no cumulative harm.  *See United States v. Rosario Fuentez*, 231 F.3d 700, 709 (10th Cir. 2000).

"If the preserved errors are cumulatively harmless, then 'the court should consider whether those preserved errors, when considered in conjunction with the unpreserved errors, are sufficient to overcome the hurdles necessary to establish plain error.'" *Rogers*, 556 F.3d at 1144 (citing *Caraway*, 534 F.3dat 1302).  That is, we look to whether the combination of the willful blindness instruction and the prosecutor's statements regarding witness credibility affected Mr. Anaya's substantial rights or "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007) (quotations omitted) (recognizing the third and fourth elements of the reversible plain error test after plain error is established).  Any conceivable error that resulted did not affect Mr. Anaya's substantial rights because the evidence of his guilt was overwhelming.  Consequently, even if we aggregate these alleged errors, there is no cumulative error.

## III. **CONCLUSION**

The evidence at trial was sufficient for a reasonable jury to convict Mr. Anaya of conspiracy. None of the alleged prosecutorial misconduct constitutes reversible plain error. If the willful blindness instruction was given in error, it was harmless. There was no cumulative error. We therefore affirm Mr. Anaya's conviction.