**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 28 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MARTIN IRIBE-PEREZ,

    Defendant - Appellant.

No. 96-1370

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 92-CR-113-7 CB)**

---

Richard N. Stuckey, Denver, Colorado, for the Defendant - Appellant.

John M. Hutchins, Assistant U.S. Attorney (Henry L. Solano, U.S. Attorney, and Wayne Campbell, Assistant U.S. Attorney, with him on the brief), Denver, Colorado, for the Plaintiff - Appellee.

---

Before **EBEL**, **KELLY** and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

Defendant, Martin Iribe-Perez, argues that the district court erred in allowing a jury to try him for certain drug offenses after that jury had been erroneously informed by the court that Mr. Iribe-Perez would be pleading guilty

to the crimes charged. We agree. After a trial judge has informed a panel of prospective jurors in a criminal case that a defendant is going to plead guilty, if the defendant decides not to do so, it is improper to constitute a jury from that same panel to try the defendant. Moreover, selection of jurors from that same panel implicates constitutional rights of such magnitude that the error is not susceptible to harmless error review. We therefore reverse appellant's conviction and remand for a new trial. We also find that, contrary to defendant's arguments, the district court did not err in refusing to dismiss his indictment after the government facilitated the departure of a potential defense witness from the United States.[1]

## I

In March 1992, the government obtained an indictment against the defendant on one count of conspiring to distribute five or more kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii)(II), and 846. On the morning of trial, jury selection was delayed by last minute plea negotiations. The negotiations were a continuation of earlier efforts that had been ongoing

---

[1] In reversing appellant's conviction and remanding for a new trial, we would not ordinarily reach further grounds for appeal. Here, however, we must do so. If appellant's arguments as to the voluntary departure of the potential witness were correct, we would not remand but would dismiss the indictment against him altogether. See United States v. Valenzuela-Bernal, 458 U.S. 858 (1982); United States v. Morales-Quinones, 812 F.2d 604 (10th Cir. 1987).

through the eve of trial. As a result of a miscommunication between the courtroom deputy and trial counsel, the trial judge believed the negotiations had failed, assumed the bench, and called the defendant's case for trial.

Defense counsel then informed the court that the parties had arranged an "alternative disposition," explaining on further inquiry from the court, "We have worked out a plea bargain." 3 Appellant's App. at 37. The court then told the venire pool:

> Very well. Ladies and gentlemen of the jury, this sometimes happens. I know that you begin to feel kind of like yo-yos from the jury room up to the Court and then back to the jury room and whatnot. But every now and then this will happen, and it is the right of the defendant in a criminal case such as this to enter a plea of guilty to the charge which is contained in the indictment of the grand jury.

> \* \* \*

> Now I am sure that Mr. Stuckey tried to work this out last Friday, and he tells me in chambers that he was unable to, and that as of last Friday we were going to go to trial, but here this morning the defendant has decided that he does not wish to go to trial, and he wishes to enter a plea of guilty to the charge contained in the indictment. This he has a right to do, and we certainly won't stop him from doing so.

> Now I am going to suggest to the jury that it would be best that you not be -- I hate to use the word -- the word is contaminated. It's possible that you could be prejudiced in some way if you were to sit here as citizens and hear these proceedings, and then if in the course of these proceedings something happened that it broke down, it's possible that your neutrality might be compromised, so I am going to suggest to you, ladies and gentlemen, that you go back to the jury room, and we will hear the defendant now on these proceedings, and

if in the course of these proceedings he doesn't wish to plead guilty, why then we will call you back.

Id. at 38-39.

After efforts to enter a guilty plea failed, the court intervened and ordered the start of trial. Over defense objection, the same jury panel was recalled and jury selection began. The court did instruct prospective jurors of their obligation to presume the innocence of the defendant, and noted that the earlier change of plea hearing could not affect that presumption in any way. Furthermore, the district court was careful to inquire of various potential jurors whether any of them thought the defendant "must be guilty" because of his apparent decision to change his plea. Id. at 91, 109. Following selection of the jury, the court denied defendant's motion for a mistrial, explaining that the panel used was the only panel available, that the court had made every effort to remove any taint, and that, under the circumstances, they would "just have to proceed." Id. at 122.[2]

---

[2] We are sympathetic to the difficulties facing the visiting judge in this case. He was assisting a busy court with a congested docket; he was supplied with only one panel of potential jurors; and he tried to accommodate the defendant by giving him the opportunity to enter a plea of guilty after the cut-off date established in the scheduling order. When the guilty plea failed to materialize, the trial judge was only trying to salvage the trial out of concern for potential problems under the Speedy Trial Act, 18 U.S.C. §§ 3161-3174. Nevertheless, we conclude that the failure to provide the defendant with an impartial adjudicator necessitates that we reverse his conviction.

**A**

Although the record reflects that the district court went to great lengths to eliminate any potential prejudice, the precedents before us do not permit jury selection under these circumstances. A criminal defendant is entitled to be tried by an impartial jury. U.S. Const. amend. VI. In Leonard v. United States, the Supreme Court held that it was plain error to select a jury from a panel of prospective jurors who, prior to their selection, had witnessed a guilty verdict returned in a separate case against the same defendant. 378 U.S. 544, 544 (1964) (per curiam); see also Oliver v. United States, 202 F.2d 521, 523 (6th Cir. 1953) ("Neither the immediate admonition of the District Judge to the jury to disregard the prosecuting attorney's question [regarding the defendant's prior guilty plea] nor the subsequent charge could, in our judgment, remove the indelibly impressed fact from the minds of the jurors that the defendant had, upon a previous occasion, pleaded guilty to the charge upon which he was being tried."); Miracle v. Commonwealth, 646 S.W.2d 720, 721 (Ky. 1983) (holding that "it is error to bring to the jury's attention that defendant's guilty plea was previously entered and withdrawn") (citing Oliver, 202 F.2d at 523).

This court recognizes that a high risk of bias exists when potential jurors are present at two separate voir dire examinations that occur proximate in time to one another, both of which involve separate charges against the same defendant.

See United States v. Gillis, 942 F.2d 707, 710 (10th Cir. 1991) (reversing defendant's conviction because the district court failed to inquire specifically whether the potential prejudice from sitting through the previous voir dire examination would bias the jurors). In addition, jurors who serve on an interim jury between voir dire and trial and have been exposed to similar legal or factual issues or the same government witnesses may be dismissed for cause because of the high risk of bias. See United States v. Franklin, 700 F.2d 1241, 1242 (10th Cir. 1983).

In the light of this case law, the district court erred in selecting the jury from a panel comprised of individuals who were informed by the trial judge immediately prior to voir dire that the defendant was going to plead guilty to the very crime of which they ultimately convicted him. The same principles of justice that led the Solicitor General to concede—with the ready endorsement of the Supreme Court—that selection of a jury under the circumstances in Leonard was plainly erroneous apply with greater force here. In Leonard, the prospective jury heard a different jury pronounce the defendant guilty of a different crime. See 378 U.S. at 544. Here, the members of the actual jury were told by the presiding judge that the defendant was pleading guilty to the very crime that they were impanelled to decide. In essence, the jury had been told that the defendant was going to admit all the material facts alleged in the indictment. See United States

v. Kelsey, 15 F.3d 152, 153 (10th Cir. 1994) (holding that plea of guilty is equivalent to admitting all material facts contained in the indictment).

Our analysis is unaffected by the trial judge's attempts to cure the defect during voir dire examination. Although we generally presume that curative instructions are followed, see United States v. Cardall, 885 F.2d 656, 668 (10th Cir. 1989), we are not convinced that it was possible to eliminate the "taint" on this jury. See Oliver, 202 F.2d at 523; cf. Donovan v. Davis, 558 F.2d 201, 203 (4th Cir. 1977) (holding that district court's attempt to remove prejudice through limiting instructions was inadequate when seven jurors had served in a prior criminal trial involving same defendant). As an example, after one venireman expressed doubt about whether he could act neutrally, stating that he couldn't "help but think about the plea bargain," 3 Appellant's App. at 111, the following colloquy ensued:

> The Court: The one thing you can't do is get in the jury room if this was to happen and balancing the evidence saying well, sounds like he was not guilty but, on the other hand, he wouldn't have offered to plea if he wasn't - - if there wasn't some guilt. You can't consider that. Do you think you could put that away and consider only the evidence that you hear from that witness stand? Can you do that?
>
> The Juror: Well, I would like to think I could, but it's still going to be in my mind, to be honest with you.

The Court:    Yeah, but we are all big people.  We can put things away from our mind, can't we?  You can too.  Can you do that?

The Juror:    I will try.

The Court:    All right.  Fine.  I can't ask more than that.

Id.[3]

In the light of this type of exchange, it is simply insufficient that each of the jurors selected stated that he or she would decide the case solely on the evidence presented.  See Willie v. Maggio, 737 F.2d 1372, 1379 (5th Cir. 1984) ("A juror is presumed to be biased when he or she is apprised of such inherently prejudicial facts about the defendant that the court deems it highly unlikely that the juror can exercise independent judgment, even if the juror declares to the court that he or she will decide the case solely on the evidence presented.").[4]

---

[3] The defendant used one of his peremptory challenges to excuse this prospective juror from the panel.

[4] Our decision has no impact on the jurisprudence of pre-trial publicity.  It is not necessary that jurors be completely ignorant of the facts and issues of the case before them.  See Irvin v. Dowd, 366 U.S. 717, 722 (1961).  Noteworthy trials will often pique the interest of the public and many potential jurors may have formed initial impressions about the case.  See id.  But that is not enough to disqualify a juror so long as that juror agrees to set aside any initial impressions.  See id. at 723; United States v. Lamb, 575 F.2d 1310, 1315 (10th Cir. 1978).  Here, however, prospective jurors were informed by the trial judge presiding over the trial that the defendant was going to plead guilty.  The effect of this information is far more troublesome than mere publicity.  The prospective jurors were essentially informed immediately before voir dire by their sole source of legal authority that the defendant was going to admit all the material facts underlying the charges against him.

**B**

The Supreme Court recognizes that a defendant in a criminal trial has certain fundamental rights, the deprivation of which mandates reversal even absent a showing of prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 309 (1991).  Examples of such rights are the right to counsel, see Gideon v. Wainwright, 372 U.S. 335, 345 (1963); the right to be tried before an impartial judge, see Tumey v. Ohio, 273 U.S. 510 (1927); the right to a public trial, see Waller v. Georgia, 467 U.S. 39, 49 & n.9 (1984); the right to self-representation, see McKaskle v. Wiggins, 465 U.S. 168, 177 n.8 (1984); and the right to have an indictment based on the judgment of a properly selected grand jury, see Vasquez v. Hillery, 474 U.S. 254, 263 (1986).  In each of these cases, the Supreme Court was unable to determine whether the error was harmless because a review of the record could not reveal the impact of the defect.

The same obstacle to review is present in this case.  The impact of the constitutional defect before us, namely the violation of the defendant's Sixth Amendment right to an impartial jury, cannot be determined from a review of the record.  See Sullivan v. Louisiana, 508 U.S. 275, 281 (1993) (holding that the right to trial by jury is a "basic protection whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function") (internal quotations omitted); Rose v. Clark, 478 U.S. 570, 578 (1986) (recognizing that

harmless error analysis presupposes a trial before an impartial jury); see also Waller, 467 U.S. at 49 n.9 (noting that it would be impossible to demonstrate the prejudicial effect of the violation of a criminal defendant's right to a public trial). It is not the function of this court to predict whether a properly constituted jury would have convicted the defendant. Cf. Sullivan, 508 U.S. at 280 (holding that it is not the role of an appellate court to determine whether a jury could have found the defendant guilty beyond a reasonable doubt but, rather, whether a jury's actual finding of guilt beyond a reasonable doubt "would surely not have been different absent the constitutional error").

The Supreme Court has long recognized that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." Chapman v. California, 386 U.S. 18, 23 (1967). The constitutional right to an impartial jury is basic and fundamental to the conduct of a fair trial. See Irvin v. Dowd, 366 U.S. 717, 722 (1961). Thus, regardless of whether we label the error in this case as "structural" or "trial," see Fulminante, 499 U.S. at 309-10 (suggesting a dichotomy between "trial errors," which may be reviewed under harmless error standards, and "structural errors," which defy harmless error review), we are satisfied that the violation of the defendant's right in this case was of such constitutional magnitude that it cannot be subjected to harmless error

review.  See Chapman, 386 U.S. at 23.  Accordingly, the judgment of conviction is reversed and we remand for a new trial.

## II

Appellant further contends that his indictment should be dismissed because the government deprived him of material exculpatory evidence when his brother, Rafael Iribe-Perez, was permitted to voluntarily depart from the United States. We are obliged to address this issue because if we find that the appellant's second ground of appeal has merit, we must dismiss the indictment against him rather than remand for a second trial.

## A

Martin Iribe-Perez was arrested for his alleged involvement in a drug distribution organization run by Genaro Almeida.  During the course of its investigation into the Almeida organization, the Federal Bureau of Investigations (the "FBI") learned that cocaine was being transported into Denver by means of a 1985 Ford Thunderbird.  At the request of the FBI, the car was stopped by local police.  Its driver was Rafael Iribe-Perez.  The only other occupant of the Thunderbird was Raul Castellon, who was later charged in the same indictment as the appellant.

To prevent the participants in the Almeida organization from discovering the existence of its ongoing investigation, the FBI orchestrated the stop of the

Thunderbird to make it look like an immigration check.  Agents from the Immigration and Naturalization Service (the "INS") were thus dispatched to question the occupants.  Upon questioning, Rafael Iribe-Perez admitted to the INS agents that he was in the country illegally.  Raul Castellon produced a resident alien identification card.  The INS agents then transported both Castellon and Rafael Iribe-Perez to an INS detention facility.  Rafael Iribe-Perez was taken into custody as an illegal alien.  Raul Castellon was detained for approximately one and a half hours while his resident alien identification card was verified.

In order to maintain the illusion that the Thunderbird had been stopped at the direction of the INS, the agents informed Rafael Iribe-Perez and Castellon that the INS was going to seize the Thunderbird pursuant to regulations governing the seizure of items used to transport illegal aliens.  In fact, the Thunderbird was transported to a garage used by the Denver division of the FBI.  A search of the Thunderbird yielded eight kilograms of cocaine.

While in detention, Rafael Iribe-Perez requested that the INS allow him to voluntarily depart from the United States.[5]  The INS granted his request and Rafael left the country.  The defendant was arrested about a week later on

---

[5]  The benefit of being permitted to voluntarily depart as opposed to being deported is that a formally deported illegal alien faces criminal penalties for merely returning to the United States.  See, e.g., 8 U.S.C. § 1326 (providing criminal penalties for deported aliens who enter or attempt to enter the United States subsequent to their deportation).

February 27, 1992. He claims that the indictment against him should be dismissed because the government facilitated the departure of Rafael Iribe-Perez, the only person who, he contends, could "totally exculpate" him. Appellant's Br. at 18.

**B**

To obtain an order dismissing his indictment, the burden is on the appellant to show that: (1) the government acted in bad faith by allowing a witness with potentially exculpatory information to depart; and (2) the voluntary departure of the absent witness prejudiced him by eliminating testimonial evidence that "would be both material and favorable to the defense." United States v. Valenzuela-Bernal, 458 U.S. 858, 873 (1982); Arizona v. Youngblood, 488 U.S. 51, 58 (1988) (establishing that "failure to preserve potentially useful evidence does not constitute a denial of due process of law" unless defendant can show government acted in bad faith).

Appellant fails to establish that the voluntary departure of Rafael Iribe-Perez deprived him of evidence "both material and favorable to the defense." See Valenzuela-Bernal, 458 U.S. at 873.[6] We do not require the defendant to provide

---

[6] Although Valenzuela-Bernal addresses the loss of a witness due to deportation, we recognize that the same standard applies when the government facilitates a voluntary departure. See United States v. Morales-Quinones, 812 F.2d 604, 608-09 (10th Cir. 1987).

a "detailed description" of the disputed testimony. Rather, he need only make a "plausible showing that the testimony of the deported witness[] would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." Id.

In this case, the appellant argues that "only [his] brother could explain" the nature and extent of the appellant's knowledge of cocaine in the seized Thunderbird. Appellant's Br. at 18 (emphasis added). Appellant argues that Rafael "might have testified that his brother . . . did not know" about the existence of cocaine in the seized Thunderbird. Id. at 19 (emphasis added). Appellant further argues that Rafael "might have shed light on . . . Castellon's role," particularly whether it was Castellon who was directing the cocaine distribution. Id. (emphasis added).

Valenzuela-Bernal, however, requires more than the mere potential for favorable testimony, see 458 U.S. at 873, and the appellant has not offered any credible reason to believe that Rafael would in fact provide exculpatory testimony. Moreover, because Rafael was charged in the same indictment as the appellant for his alleged involvement in the Almeida drug distribution scheme, it is likely that Rafael would have invoked his Fifth Amendment privilege to remain silent had he been present as a witness for the defendant's trial. See United

States v. Stassi, 544 F.2d 579, 582 (2d Cir. 1976).  We therefore hold that the district court correctly denied the appellant's motion to dismiss his indictment.[7]

### III

The appellant argues that a chemist's report introduced by the government was inadmissible hearsay.  Because the case is remanded for a new trial, and because we cannot predict that the evidence regarding the chemical report will be presented in the same manner, we decline to address this issue.

REVERSED AND REMANDED.

---

[7] The trial court appropriately recognized that Rafael Iribe-Perez would be a proper witness.  Our holding that the defendant is not entitled to have the indictment against him dismissed does not affect the propriety of calling Rafael as a witness.  Because we remand for a new trial, the appellant is afforded the potential of calling his brother in support of his defense.