**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 5, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee,

v.

EFRAIN GONZALEZ-PEREZ,

　　　　Defendant - Appellant.

No. 13-2147
(D.C. No. 1:12-CR-01085-LH-1)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **O'BRIEN**, and **MATHESON**, Circuit Judges.

　　A jury convicted Efrain Gonzalez-Perez of illegally transporting an alien, Daniel

Perez-Soto. He claims the indictment must be dismissed because the government

permitted an important witness to voluntarily return to Mexico without first affording him

an opportunity to depose the witness. He also alleges his trial was riddled with problems,

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

including translation errors and the admission of improper hearsay and expert testimony. None of his arguments pass muster. We affirm.

## I. BACKGROUND

In the summer of 2011, "John Smith"[1] was arrested in Texas and charged with illegal transportation of an alien. In exchange for dismissal of the charges, Smith agreed to cooperate with the FBI.[2] He did so, in part, by identifying Gonzalez-Perez as someone he had worked with in the past to smuggle illegal aliens into this country.

On March 9, 2012, Gonzalez-Perez called Smith regarding the transportation of an illegal alien from El Paso, Texas, to Albuquerque, New Mexico. He told Smith he would be in contact to confirm the individual's location in El Paso. Two days later, on March 11, 2012, he called Smith, with words to the effect that "the fucker's still there." (Appellant's App'x at 114.) This phone conversation was recorded and played for the jury. Gonzalez-Perez had used the Spanish term "cabrón," which FBI Agent John Wardle, a Spanish speaker, told the jury is a derogatory term meaning "fucker." (Appellant's App'x at 130.)

On March 14, 2012, Gonzalez-Perez again called Smith, this time to give him a telephone number he could use to contact the individual in El Paso. He told Smith to refer to the individual as "Daniel tocayo." (Appellant's App'x at 114.) This conversation

---

[1] "John Smith" and the other confidential informant involved in this case, "James Jones," were allowed to testify under pseudonyms to protect their true identities.

[2] At the time of trial (January 28, 2013), the FBI had paid Smith a total of $5,000 for his services and expenses in this and other cases.

was also recorded and played for the jury. In his testimony, Wardle explained the use of the Spanish word "tocayo" is significant because it refers to someone who shares the same last name as the speaker and Gonzalez-Perez and the individual in El Paso, later identified as Perez-Soto, share the same surname—Perez.

Later that day, Smith found Perez-Soto in El Paso and drove him to a motel in Las Cruces, New Mexico. After showing Perez-Soto where he would be picked up in the morning, Smith secured him in a motel room and left with the room key.

The next morning, "James Jones," another confidential informant working for the FBI, collected Perez-Soto from the motel in a flatbed tractor-trailer. After Jones and Perez-Soto passed through the Border Patrol checkpoint just outside of Las Cruces,[3] Gonzalez-Perez called Smith to inform him "they were done at the store," meaning Jones and Perez-Soto had made it through the checkpoint.[4] (Appellant's App'x at 119.)

As Jones and Perez-Soto continued their journey north to Albuquerque, Gonzalez-Perez made a number of telephone calls to Smith. In one of those calls, he informed Smith he was going to change his location because of his concern about looking "suspicious." (Appellant's App'x at 119.) In another call, Gonzalez-Perez told Smith he had paid $800 to get Perez-Soto across the border and he would profit very little from the operation.

---

[3] The FBI obtained permission from the United States Border Patrol for Jones and Perez-Soto to pass through the checkpoint undetected. But, to maintain the ruse that Jones was a legitimate alien smuggler, the FBI instructed Jones to hide Perez-Soto in the sleeper compartment of the truck's cab before passing through the checkpoint.

[4] The record does not reveal how Gonzalez-Perez came to know of their progress.

Jones drove Perez-Soto to a truck stop in Albuquerque where Gonzalez-Perez was waiting in his pickup truck. After Gonzalez-Perez paid Jones $1,200,[5] he and Perez-Soto left in the pickup. As they were leaving the truck stop, Gonzalez-Perez called Smith to tell him "it's done." (Appellant's App'x at 125.) The entire trip—from El Paso to Albuquerque—was observed by either FBI or Border Patrol agents.[6]

After the two men left the truck stop, a Border Patrol agent stopped the pickup. When the agent inquired about their citizenship, Gonzalez-Perez stated he was a lawful permanent resident. Perez-Soto neither made a claim of U.S. citizenship nor provided any documentation showing he was lawfully in this country. The agent took both men into custody.

After his arrest, Gonzalez-Perez called Smith to tell him it was "fucked up." (Appellant's App'x at 125.) He had been arrested, but had said nothing to the agents; he did not know what Perez-Soto may have told them. He told Smith to no longer contact him on his telephone number and suggested that Smith dispose of his phone.

FBI Agent John Wardle interviewed Perez-Soto, who disclosed the following. He first provided purely historical information. He had first entered the United States in 1989 and had lived in Los Angeles, California, for nine years. In 1997, he moved to Cactus, Texas. At one time, he had a work authorization permit. In 2008 or 2009, his

_____

[5] Agent Wardle testified that in his experience the price for transporting an illegal alien from El Paso to Albuquerque is approximately $1,200.

[6] The FBI also took pictures of Gonzalez-Perez and Perez-Soto walking from the flatbed trailer to Gonzalez-Perez's pickup truck and of Perez-Soto getting into the pickup.

vehicle was stopped by an officer who discovered he was using his uncle's driver's license. Facing deportation, he agreed to leave voluntarily. In July 2011, he surrendered his work authorization permit and returned to Mexico. But a few months later, he decided to return to Cactus where his son, a U.S. citizen, was living. But then his statement took a peculiar turn; one contrary to what Wardle knew about the case. Perez-Soto claimed to have traveled to Juarez, Mexico, where he paid someone $50 to show him where to safely cross the border. After arriving in El Paso, he paid $1,500 to a smuggler who gave him a ride in the trunk of his car to Albuquerque. He claimed to have been living with cousins at a house near the Flying J in Albuquerque for approximately thirty days prior to his arrest. He said a truck driver friend told him about a man named Efrain (presumably Efrain Gonzalez-Perez) who would give him a job. His friend took him to the truck stop to meet with Efrain. Efrain picked him up at the truck stop so Efrain could familiarize him with the job.

Perez-Soto's biographical information and fingerprints were entered into the Border Patrol's ENFORCE and IDENT computer programs. The results showed Perez-Soto had been voluntarily returned to Mexico in 2009 after being apprehended in Oklahoma City and was now illegally in this country. The Border Patrol subsequently offered him the opportunity to voluntarily return to Mexico, an offer he readily accepted.[7] He was not available for trial and his whereabouts are unknown.

---

[7] "The benefit of being permitted to voluntarily depart as opposed to being deported is that a formally deported illegal alien faces criminal penalties for merely
(Continued . . . )

Gonzalez-Perez was indicted two months later with transporting an illegal alien in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). After a two-day trial, the jury returned a guilty verdict. The judge sentenced Gonzalez-Perez to ten months imprisonment.

## II. DISCUSSION

Gonzalez-Perez presents five arguments: (1) the indictment must be dismissed because the testimony of Perez-Soto, a material witness, was unavailable due to government agents permitting him to return to Mexico; their acts, he says, violated his Fifth Amendment due process rights and his Sixth Amendment right to compulsory process; (2) through FBI Agent Wardle's testimony the government impermissibly introduced Perez-Soto's post-arrest statements concerning his immigration status; (3) Border Patrol Agent Brian Knoll improperly offered expert opinion that he had the requisite mental state to commit the offense, a violation of Rule 704(b) of the Federal Rules of Evidence (Rule 704(b)); (4) Wardle made two translation errors resulting in an unfair trial; and (5) the cumulative effect of these errors requires reversal of his conviction.

A.     Release of Perez-Soto to Mexico

The government's release of Perez-Soto to Mexico triggered two pretrial motions by Gonzalez-Perez—a motion to dismiss the indictment and a motion in limine to preclude the government from offering into evidence any of Perez-Soto's post-arrest

---

returning to the United States." *United States v. Iribe-Perez*, 129 F.3d 1167, 1173 n.5 (10th Cir. 1997) (citing, e.g., 8 U.S.C. § 1326).

statements concerning his nationality, immigration status, or the manner of his entry into the United States.

The district judge took the motion to dismiss under advisement until the close of the evidence, at which time he denied it. Relevant here, he decided Gonzalez-Perez had failed to demonstrate bad faith on the part of the government—it disclosed Perez-Soto's statements to the defense, it provided a reasonable explanation for why it did not deem the statements exculpatory (his statements about living in Albuquerque for a month prior to his arrest were patent lies exposed by the constant surveillance of him traveling from El Paso to Albuquerque) and nothing indicated the government had departed from normal deportation procedures in allowing Perez-Soto to voluntarily depart to Mexico.

The judge granted the motion in limine. He concluded (and the government agreed) Perez-Soto's inculpatory post-arrest statements concerning his immigration status were inadmissible because they constituted testimonial statements by an unavailable witness who the defendant, Gonzalez-Perez, had not had a prior opportunity to cross-examine.

1.      Motion to Dismiss Indictment

We review the denial of a motion to dismiss an indictment for an abuse of discretion; we will not disturb the decision "unless there is a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." *United States v. Barajas-Chavez*, 358 F.3d 1263, 1267 (10th Cir. 2004) (citation and quotation marks omitted). To obtain dismissal of an indictment based on the government's deportation of a witness, the defendant must show:

- 7 -

"(1) the government acted in bad faith by allowing a witness with potentially exculpatory information to depart; and (2) the voluntary departure of the absent witness prejudiced him by eliminating testimonial evidence that 'would be both material and favorable to the defense.'"[8] *United States v. Iribe-Perez,* 129 F.3d 1167, 1173 (10th Cir. 1997) (quoting *United States v. Valenzuela-Bernal,* 458 U.S. 858, 873 (1982), and citing *Arizona v. Youngblood,* 488 U.S. 51, 58 (1988)). Because the government agents did not act in bad faith, we need not address the particulars of Perez-Soto's possible testimony.

"The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood,* 488 U.S. at 56 n.*. Negligence is not enough to establish bad faith. *Id.* at 58. There must be (1) willful conduct motivated by a desire to obtain a tactical advantage over the defense or (2) a departure from the government's normal deportation procedures. *Cf. California v. Trombetta,* 467 U.S. 479, 488 (1984) (holding State's failure to retain breath samples did not state a constitutional violation because in failing to preserve those samples, the state officers "were acting in good faith and in accord with their normal practice" and there was no allegation of "official animus towards respondents or of a conscious effort to suppress exculpatory evidence"); *Taylor v. Illinois,* 484 U.S. 400, 415-17 (1988) (defense witness was properly excluded based on discovery order violation which was "both

---

[8] The same standard applies when the government facilitates a voluntary departure. *See United States v. Morales-Quinones,* 812 F.2d 604, 608-09 (10th Cir. 1987); *see also Iribe-Perez,* 129 F.3d at 1173 n.6

willful and blatant" and where circumstances showed defense counsel "was deliberately seeking a tactical advantage"); *see also United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000) (stating bad faith requires "official animus or a conscious effort to suppress exculpatory evidence") (quotations omitted); *United States v. Pena-Gutierrez*, 222 F.3d 1080, 1085 (9th Cir. 2000) (concluding a showing of bad faith requires proof the government departed from its normal deportation procedures or deported the witness to gain an unfair tactical advantage over the defendant at trial).

In support of his bad faith argument, Gonzalez-Perez claims Agent Wardle knew Perez-Soto could offer potentially exculpatory evidence and released him so the government would gain a tactical advantage. He doth protest too much.

At the time of his release, Wardle knew Perez-Soto claimed to have been living in Albuquerque for a month prior to his arrest and to have been driven to the truck stop in Albuquerque by a friend in order to meet Gonzalez-Perez regarding a job opportunity. But Wardle knew several other important things: this story directly contradicted his own observation of Perez-Soto being picked up in El Paso the day before his arrest and driven to Albuquerque by Jones on the day of his arrest; Gonzalez-Perez's payment of $1,200 to Jones for Perez-Soto's transportation; the recorded telephone conversations in which Gonzalez-Perez is arranging for Perez-Soto's transportation by Smith; and his complaints of making little profit from the transaction. Wardle was confronted with a potential witness who was almost certainly lying about those matters and the transparent lies could be easily disproved. We cannot fault him for believing Perez-Soto's testimony would not be helpful to either the government or the defense.

But credibility determinations are for the jury. *See United States v. Davis*, 473 F.2d 1023, 1025 (10th Cir. 1973). Conceivably, had Perez-Soto not been allowed to voluntarily depart the country, his testimony could have been preserved and presented to the jury and, although highly unlikely, the jury could have chosen to believe him in spite of the other evidence. In an abundance of caution the more prudent practice might have been for Wardle to detain Perez-Soto until defense counsel could preserve his testimony before he was permitted to voluntarily depart.

Nevertheless, the tipping point is bad faith, not merely negligence. Contrary to Gonzales-Perez's speculation, there is no credible evidence of Wardle willfully (rather than negligently) releasing Perez-Soto in order for the government to gain a tactical advantage at trial. He did not try to conceal the statements. And the government's case also took a hit—Perez-Soto's unavailability for trial prevented it from introducing a recorded telephone conversation between Perez-Soto and Smith in some degree implicating Gonzalez-Perez in the illegal transportation. Moreover, there is no indication the government departed from its normal deportation practices in allowing Perez-Soto to depart.

Grasping at a slender reed, Gonzalez-Perez urges us to follow the Ninth Circuit's decision in *United States v. Leal-Del Carmen*. In that case, the court adopted a per se rule: "When the government doesn't know what a witness will say, it doesn't act in bad faith by deporting him. But if the government interviews the witness or has other information suggesting that he could offer exculpatory evidence, the government may not deport him without first giving defense counsel a chance to interview him [and the

- 10 -

opportunity to decide whether to seek his retention pending trial]." 697 F.3d 964, 970 (9th Cir. 2012). It reasoned: "The government is uniquely empowered to deport witnesses and thus put them outside the reach of defense counsel and the district court. It may not use that power to give itself an unfair advantage." *Id.* at 971.

We decline to follow the Ninth Circuit. A per se rule requiring the government to always detain alien witnesses with potentially exculpatory information unduly interferes with the immigration laws enacted and to be executed by the political branches of our government. Moreover, a per se rule essentially presumes bad faith on the part of the government. The presence of bad faith must be proved, not its absence.

2. Motion in Limine

The judge granted (without objection) Gonzalez-Perez's motion in limine seeking to exclude the post-arrest statements Perez-Soto made to Wardle concerning his immigration status. He concluded the statements were inadmissible under *Crawford v. Washington*, 541 U.S. 36 (2004), because they were testimonial statements, made by an unavailable witness, not subject to cross-examination or even questioning. The government nevertheless introduced the following statements at trial:

[Prosecutor]: [D]id you interview [Perez-Soto] after he was arrested?

[Agent Wardle]: I did.

[Prosecutor]: Okay. Can you tell me what information he gave you?

[Agent Wardle]: He confirmed that he was not a U.S. citizen.

. . . .

[Prosecutor]: Did he mention that he had . . . previously lived in the United States?

[Agent Wardle]: He did.

[Prosecutor]: And what did he say?

[Agent Wardle]: He said that in 2009 he was living in Oklahoma and had been granted voluntary return to Mexico.

(Appellant's App'x at 124.)

Gonzalez-Perez did not object to the questioning. However, both parties suggest that his pretrial motion in limine adequately preserved this argument for appeal. But that is a legal issue for a court to decide. *See United States v. Fonseca*, 744 F.3d 674, 682 (10th Cir. 2014) ("[T]he court, not the parties, must determine the standard of review.") (citation and quotation marks omitted). And the parties' urging improperly states the law.

In *United States v. Mejia-Alarcon*, we held a pretrial motion in limine may preserve an objection for appeal when (1) the matter was adequately presented to the district court, (2) the issue is of the type that can be finally decided in a pretrial hearing, i.e., the issue is a matter of law and not a fact-bound determination dependent upon the character of evidence introduced at trial, and (3) the district court's ruling was definitive. 995 F.2d 982, 986-87 (10th Cir. 1993). More recently, however, we said the granting of a party's pretrial motion in limine to exclude evidence does not relieve that party from contemporaneously objecting when the excluded evidence is admitted. *Fonseca*, 744 F.3d at 683. In these circumstances, requiring a contemporaneous objection would not be futile but would instead alert the court to new error—violation of the court's earlier ruling. *Id.* When the government introduced Perez-Soto's post-arrest statements in

- 12 -

violation of the liminal order excluding them, Gonzalez-Perez was required to object in order to preserve the argument for appeal. Since he did not, our review is for plain error. *United States v. Pablo*, 696 F.3d 1280, 1287 (10th Cir. 2012). Plain error review requires Gonzalez-Perez to show "(1) there was error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Williamson*, 746 F.3d 987, 992 (10th Cir. 2014) (citation omitted). "We apply these requirements less rigidly when reviewing a potential constitutional error." *Pablo*, 696 F.3d at 1287 (quotations omitted).

Since, in this appeal, the government has admitted error, we will assume, without deciding, that Agent Wardle's testimony relating Perez-Soto's post-arrest statements concerning his immigration status was inadmissible under the Sixth Amendment's Confrontation Clause. *See United States v. Chavez*, 481 F.3d 1274, 1277 n.2 (10th Cir. 2007). We also assume the error was plain. Nevertheless, Gonzalez-Perez has not shown it to have been sufficiently momentous to require reversal.

"Satisfying th[e] third prong of plain-error review usually means that the error must have affected the outcome of the district court's proceedings." *Pablo*, 696 F.3d at 1293 (quotations omitted). The defendant "must show a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *Id.* (quotations omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Hasan*, 526 F.3d 653, 665 (10th Cir. 2008) (quotations omitted).

There was abundant other evidence of Perez-Soto's unlawful status. The border patrol agent who arrested Gonzalez-Perez and Perez-Soto testified that when he inquired of their citizenship, Gonzalez-Perez said he was a lawful permanent resident; Perez-Soto, on the other hand, made no claim of citizenship and had no papers showing he was lawfully in the United States. Another border patrol agent told the jury that when he ran Perez-Soto's biological information and fingerprints into the border patrol's computer systems, the results showed he had been voluntarily returned to Mexico in 2009 and was, at the time of the inquiry, unlawfully in the United States. The jury also heard that Perez-Soto agreed to voluntarily return to Mexico, an unlikely choice if he were lawfully in the United States. Gonzalez-Perez has not carried his burden of showing a reasonable probability of acquittal had the offending testimony not been introduced.

B.     Expert Testimony—Rule 704(b)

8 U.S.C. § 1324(a)(1)(A)(ii) "makes it illegal for a person who, knowing or in reckless disregard of the fact that an individual is an illegal alien, transports or moves, or attempts to transport or move, the alien in furtherance of the alien's illegal entry or continued illegal presence in the United States." *United States v. Barajas-Chavez*, 162 F.3d 1285, 1287-88 (10th Cir. 1999) (en banc) (quotations omitted). The "in furtherance of" element "requires that a defendant know or act in reckless disregard of the fact that an individual is an illegal alien, and that defendant's transportation or movement of the alien will help, advance, or promote the alien's illegal entry or continued illegal presence in the United States." *Id*. at 1288. The jury was so instructed, but the issue here is the admission of evidence.

Prior to trial, the government noticed its intent to offer Border Patrol Agent Brian Knoll as an expert on alien smuggling organizations. It anticipated Knoll would testify that when an alien smuggling organization moves an alien from the border to the interior of the United States, the odds of the alien being detected by law enforcement decrease while his opportunities for employment increase. Relying on Rule 704(b), Gonzalez-Perez filed a motion in limine objecting to any attempt by Knoll to offer an opinion on his mental state at the time of the alleged crime. The government amended its notice; it predicted Knoll would testify that when an alien smuggling organization moves an alien from one point to another, especially to a point where he is less likely to be detected, it typically does so to further the alien's illegal presence in the United States because the alien, as inventory, has value to the organization. The judge deferred ruling on the issue until trial.

At trial, Agent Knoll testified in pertinent part:

[Prosecutor]: And so let me ask you, if you're moving an alien from a place, such as, in this case, a truck stop, into a more private place, which would include a privately owned vehicle, does that potentially further the illegal alien's presence in the United States?

[Agent Knoll]: It absolutely furthers that person's entry into the United States.

[Prosecutor]: Why is that?

[Agent Knoll]: The . . . principal reason is to avoid detection by law enforcement and to get that person from their home country to their final destination in the United States.

[Prosecutor]: And the fact that the automobile moves from one place to another would facilitate that?

[Agent Knoll]: Right, because it blends in with the rest of society.

- 15 -

[Prosecutor]: In a privately owned automobile, unless there is a traffic stop or something like that, is it unlikely that the alien will come into contact with the public at large?

[Agent Knoll]: That . . . illegal alien would go undetected.

[Prosecutor]: Now, if an alien smuggling organization is moving an alien from point A to point B . . . can you tell me what the primary incentive is?

[Agent Knoll]: Profit.

[Prosecutor]: And so, if an alien smuggling organization is moving an alien from point A to point B, and the motive is profit, is there any incentive to move that alien where that person would be more likely to get detected?

[Agent Knoll]: No, because . . . the person is a commodity. If he loses that -- he or she loses that commodity, the smuggler does not make a profit.

. . . .

[Prosecutor]: Now, so are you aware of there being evidence in this case that the defendant, Efrain Gonzalez-Perez, paid a confidential informant, known as James Jones, $1,200 to deliver an alien to Albuquerque, that there is evidence of that?

[Agent Knoll]: There is evidence.

[Prosecutor]: Does that have any significance to you in terms of the motivation of the alien smuggler?

(Appellant's App'x at 190-91.)

At this point, defense counsel objected, arguing the question "invades the province of the jury as an expert." (Appellant's App'x at 192.) The judge overruled the objection. Nevertheless, the prosecutor abandoned that question in favor of a more general approach. The colloquy continued:

[Prosecutor]: There is that $1200 payment. Does that represent an investment on the part of the smuggler in the alien?

- 16 -

[Agent Knoll]: Again, alien smuggling is very personal. You're dealing with people. If . . . one person pays another $1200 and gets somebody else in return, yes, there is an investment in that.

[Prosecutor]: Based on that investment, would there be an incentive on the part of the investor to further that alien's illegal presence in the United States?

[Agent Knoll]: Yes.

(Appellant's App'x at 192.) Defense counsel did not object to this latter questioning.

Gonzalez-Perez challenges two aspects of Knoll's testimony—his statement that moving an illegal alien from a place like a truck stop to a private space like a personal vehicle "absolutely furthers" the alien's presence in the United States and his statement that a payment of $1,200 would provide an incentive to further the alien's presence in the United States. According to Gonzalez-Perez, this testimony violates Rule 704(b) because it goes beyond merely providing expert testimony regarding the general practices of alien smuggling organizations and instead specifically and definitively implies that Gonzalez-Perez acted with the requisite intent, i.e., his actions were undertaken "in furtherance of" or with the intent to assist Perez-Soto's illegal entry or presence in the United States.

As with Perez-Soto's statements, Gonzalez-Perez is only entitled to plain error review of this issue. He did not object when the prosecutor asked Knoll whether moving an alien from a truck stop to a private vehicle furthers that alien's illegal presence in the United States. *See United States v. Anaya*, 727 F.3d 1043, 1053 (10th Cir. 2013) (reviewing for plain error where defendant did not object). And, while he did object to the question about how the $1,200 payment to Jones might provide insight into Gonzalez-

Perez's motivation, that question was abandoned and he did not object to the re-phrased, more general, question.[9]  *Id.* at 1058 nn.9 & 10.

Rule 704(b) provides:  "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone."  The scope of the rule is limited—expert testimony "expressly stating the final conclusion or inference as to a defendant's mental state" is off limits, but testimony of "facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state" is fair game.  *United States v. Goodman*, 633 F.3d 963, 970 (10th Cir. 2011); *see also United States v. Archuleta*, 737 F.3d 1287, 1298 (10th Cir. 2013) (experts may "properly testify to facts or opinions from which the jury could conclude or infer that" a defendant had a required mental state but the "final inference is for the trier of fact alone.") (quotations omitted), *cert. denied*, 134 S. Ct. 2859 (2014).

Knoll's testimony did not violate Rule 704(b).  He simply testified to facts and offered permissible opinions.  Accentuating a fairly obvious fact, Knoll said moving an alien from a public place to a private place furthers the alien's presence in the United States (because it lessens the chances of being noticed).  Notably, he offered no opinion about whether Gonzalez-Perez, in particular, intended to further the alien's presence.  That was left to the jury, which could reasonably expect—based on all of the facts and

---

[9] Gonzalez-Perez's pretrial motion in limine did not preserve the issue because the judge did not announce a definitive ruling on the motion, deciding instead to rule on the issue at trial.  S*ee Mejia-Alarcon*, 995 F.2d at 987.

circumstances of this case—that Gonzales-Perez intended the probable consequences of his voluntary acts. Knoll also emphasized the business aspect of alien smuggling, pointing out that smugglers treat aliens as a commodity. In doing so he underscored what seems to be an unremarkable proposition: money paid by a smuggler to move an alien is a cost of doing business, in other words an investment in the commodity being moved. Recouping costs and making a profit is an incentive for any smuggler to further an alien's presence in the United States (the ultimate objective of a smuggling enterprise). The analogy provided an understandable way for the jury to connect the dots. Knoll's answers spoke to alien smuggling in general, not Gonzalez-Perez specifically. Critically, the jury was left to decide whether Gonzalez-Perez had the requisite mental state and there were more than sufficient facts for it to conclude that he was a smuggler, motivated by profit to assist an alien in illegally remaining in this country.

Admittedly, the prosecutor interjected some case facts into his questions. By doing so, he brought Knoll dangerously (and needlessly) close to crossing the line from permissible expert testimony to invading the province of the jury. But the use of hypotheticals mirroring the facts of the case only violates Rule 704(b) when it "attempt[s] to bring forth expert opinion as to the very mental state at issue in the case—the defendant's mens rea when he committed the crime." *Goodman*, 633 F.3d at 970. No violation occurs when their use "still allows the fact finder to make an additional inference as to whether the defendant had the mental state or condition constituting an element of the crime charged." *Id.* In this case, although the prosecutor introduced some of the facts of this case into his questions, Knoll was more circumspect, answering in

- 19 -

terms of alien smugglers in general, thereby leaving the jury to make the additional and necessary inference about Gonzalez-Perez's mental state.

Two of the cases relied on by Gonzalez-Perez are inapposite. In *Shaffer* and *Warshak*, the experts opined or sought to opine that the defendant had or did not have the requisite mental state to commit the crime. *See United States v. Shaffer*, 472 F.3d 1219, 1225 (10th Cir. 2007) (concluding the district court did not err in refusing to permit a computer expert from offering his opinion that based upon the file structure of defendant's computer hard drive, the defendant was on a "porn fishing expedition with no particular calculation toward any particular type of material, other than generally sexually explicit material"; such opinion would improperly suggest to the jury, in violation of Rule 704(b), that the defendant "did not *knowingly* possess or distribute unlawful child pornography as opposed to simple adult pornography") (quotations omitted); *United States v. Warshak*, 631 F.3d 266, 324 (6th Cir. 2010) (holding Rule 704(b) was violated by expert testimony that the business dealings of defendant's company were commingled with his personal dealings with the "intent to conceal" and that certain cash transactions were "designed to conceal"; the former spoke directly to the defendant's *mens rea* to commit money laundering and the latter was tantamount to declaring that the individual who conducted the transactions intended to achieve the outcome).

*United States v. Dennison* is a closer call, but cannot carry the day. In *Dennison*, the defense expert sought to offer his opinion that alcohol and drug consumption by a hypothetical person with the same mental disorder suffered by the defendant would render the person incapable of forming the specific intent necessary to commit assault.

937 F.2d 559, 564-65 (10th Cir. 1991). We concluded the opinion was properly excluded under Rule 704(b) because, although couched in terms of a hypothetical person, "the necessary inference was that the instant defendant did not have the capacity to form specific intent at the time of his crimes because of the combined effects of his intoxication and mental illness." *Id.* Unlike in this case, the expert's opinion in *Dennison* left no room for the jury to infer, on its own, the defendant's requisite mental intent.

Even assuming error, however, Gonzalez-Perez has not satisfied the third prong of plain error review, i.e., "that [any] error affected the outcome of the district court's proceedings." *Pablo*, 696 F.3d at 1293 (quotations omitted). There was copious other evidence (the surveillance, recorded telephone calls, the $1,200 payment) demonstrating he transported Perez-Soto from El Paso to Albuquerque with the intent to help him remain in this country illegally.

C.    Translation Errors

The jury heard the March 9 and March 14, 2012 telephone conversations between Gonzalez-Perez and Smith. The conversations were in Spanish, which Agent Wardle interpreted for the jury. The government did not offer Wardle as an expert in the Spanish language but he testified to being fluent in Spanish, having studied Spanish in high school and college, and having lived in Guatemala for two years. He also said he took a test prior to enrolling in college to gauge his fluency in Spanish; the results of the test placed him in advanced level Spanish courses.

In this appeal and for the first time, Gonzalez-Perez claims Wardle made two translation errors:  (1) saying "cabrón" means "fucker" and (2) testifying "tocayo" is used to refer to someone who shares the same last name as the speaker.  Because he did not object in the district court, we once again review for plain error.

In an attempt to show error, Gonzalez-Perez has submitted an affidavit from Jose Raul Natividad, a police officer in Belen, New Mexico, who claims to be "an expert by experience and knowledge in Mexican-Spanish."  (Appellant's App'x at 220.)  According to Natividad, the word "cabrón" as used in Mexican-Spanish is not derogatory but instead is "used neutrally and sometimes even affectionately.  It is most accurately translated as dude, buddy, or brother, but most certainly, standing alone, does not mean 'fucker' as translated by . . . Wardle."  (*Id.*)  Natividad also takes issue with Wardle's translation of "tocayo."  He contends the word is not used in the context of someone who shares the same surname but "is universally understood by Spanish speakers to mean a person who shares the same <u>first or middle</u> name."[10]  (Appellant's App'x at 221.)

But Gonzalez-Perez did not file Natividad's affidavit with the district court.  Nor has he sought leave to supplement the appeal record with the affidavit.  Normally, we will not consider material outside the record before the district court.  *See United States v. Kennedy*, 225 F.3d 1187, 1191 (10th Cir. 2000); *see also United States v. Farnsworth*, 92 F.3d 1001, 1009 n.5 (10th Cir. 1996) (striking document attached to government's brief

---

[10] While cross-examining Agent Wardle at trial, defense counsel suggested "tocayo" referred to persons who share the same first name but he did not offer independent evidence to this effect.

which was not before the district court). We see no reason to deviate from that practice here. Although the affidavit does suggest translation errors occurred at trial, we have no way of authenticating the affidavit, in particular, Natividad's claim to be an expert in the Mexican-Spanish language or his translations. Moreover, we fail to see why this affidavit could not have been presented to the district court, either in the midst of trial or in a post-trial motion. Consequently, "we conclude the circumstances in the present case do not lead us to believe the interests of justice would best be served by exercising our inherent equitable power to allow [Gonzalez-Perez] to supplement the record on appeal or remanding the issue to the district court." *Kennedy*, 225 F.3d at 1192 (agreeing with the Eleventh Circuit "that, under some circumstances, we have an inherent equitable power to supplement the record on appeal"). Without the affidavit, Gonzalez-Perez has utterly failed to show an error occurred. We note in passing that the translation errors, if that they be, were not the object of a contemporaneous objection and, in any event, are insignificant when considered against the backdrop of all of the other evidence.

D.    Cumulative Error

Gonzalez-Perez argues cumulative error deprived him of a fair trial. "To analyze cumulative error, we aggregate all the errors that we have found to be harmless and determine whether their cumulative effect on the outcome of the trial mandates reversal." *Anaya*, 727 F.3d at 1060-61. "Cumulative error analysis applies only if true errors occurred." *Id.* at 1061. We have not identified error; we have only assumed error. The assumed errors did not, even considered in the aggregate, affect Gonzalez-Perez's substantial rights. His guilt is patently obvious.

- 23 -

**AFFIRMED.**

Entered by the Court:

**Terrence L. O'Brien**
United States Circuit Judge